AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

FILED
CLERK, U.S. DISTRICT COURT

AUG 11 2023

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT

8/11/2023

CENTRAL DISTRICT OF CALIFORNIA
BY:_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| JACOB WOLFGANG GONZALEZ, JOSHUA NATHAN BEDARD, KRISTOPHER CHASE MALILAY, and ERNESTO ROBERTO YBARRA, | Case No.   2:23-mj-04115-DUTY |
| Defendants | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between October 27, 2022 and May 18, 2023, in the county of Santa Barbara in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Engaging in the Business of Dealing in Firearms Without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Christopher Stantzos
_____
Complainant's signature

Christopher Stantzos, ATF Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  8/11/2023

_____
Judge's signature

City and state:  Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
_____
Printed name and title

AUSA: David C. Lachman (x5546)

**AFFIDAVIT**

I, Christopher P. Stantzos, being duly sworn, declare and state as follows:

## I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrants against Jacob Wolfgang GONZALEZ ("GONZALEZ"), Joshua Nathan BEDARD ("BEDARD"), Kristopher Chase MALILAY ("MALILAY"), and Ernesto Roberto YBARRA ("YBARRA") for a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License.

2.    This affidavit is also made in support of applications for warrants to search the following:

a.    4838 Sanchez Drive, Guadalupe, California 93434 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1;

b.    4901 Sandpiper Lane, Guadalupe, California 93434 ("SUBJECT PREMISES 2"), as described more fully in Attachment A-2;

c.    416 W. North Avenue, Apartment #89, Lompoc, California 93436 ("SUBJECT PREMISES 3"), as described more fully in Attachment A-3;

d.    The person of GONZALEZ), as described more fully in Attachment A-4;

e.    The person of BEDARD, as described more fully in Attachment A-5;

f.    The person of MALILAY, as described more fully in Attachment A-6; and

g.    The person of YBARRA, as described more fully in Attachment A-7.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms and Manufacturing Firearms Without a License), 18 U.S.C. § 922(d) (Unlawful Sale of Firearms), 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearms and Ammunition), 18 U.S.C. 922(k) (Possession Of Firearms With Removed and Obliterated Serial Number), 18 U.S.C. § 922(o) (Possession of Machineguns), 18 U.S.C. § 933 (Trafficking in Firearms), 26 U.S.C. § 5861(a) (Engaging in the Unregistered Business of Manufacturing or Dealing in Firearms), 26 U.S.C. § 5861(d) (Possession of Unregistered Firearms), and 18 U.S.C. § 371 (Conspiracy to Commit the Aforementioned Offenses), as to SUBJECT PREMISES 1, SUBJECT PREMISES 3, BEDARD, MALILAY, and YBARRA (the "FIREARMS SUBJECT OFFENSES"), as described more fully in Attachment B-1.  The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of the FIREARMS SUBJECT OFFENSES and violations of 21 U.S.C. § 841 (Distribution of and Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Controlled Substances Conspiracy) (the "DRUG SUBJECT OFFENSES"), as to GONZALEZ and SUBJECT PREMISES 2, as described more fully in Attachment B-2.  Attachments A-1 through A-7, B-1 and B-2 are incorporated herein by reference.

2

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.    BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since March 2020.  I attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations.  Before joining the ATF, I was an Intelligence Analyst for the Federal Bureau of Investigation ("FBI") for approximately four and a half years.  As an Intelligence Analyst, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations.  Before joining the FBI, I was a forensic scientist for the Washington, DC Department of Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

3

6.     As an ATF agent, I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and drug trafficking.  Additionally, I have participated in many aspects of gang, firearms, and drug trafficking investigations, including undercover operations, arrests, physical and digital device search warrants, physical and electronic surveillance, GPS tracker installations, and the analysis of telephone call detail records.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of firearm-trafficking and drug-trafficking, and money-laundering methods used to conceal the nature of the proceeds.  I have conducted and participated in multiple investigations involving the illegal manufacture and sale of firearms.  I have assisted in the execution of multiple search warrants for investigations related to the illegal manufacture and sale of firearms and the sale of drugs.  I am familiar with the methods employed by individuals involved in firearms and drug trafficking to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

7.     Over the course of twelve controlled transactions, between October 2022 and May 2023, **GONZALEZ** sold and/or facilitated the sale of 28 firearms and firearms parts and accessories to individuals whom GONZALEZ believed to be firearms

customers but who in fact were an undercover ATF agent (the
"UC") and/or a Confidential Informant (the "CI")[1].  One of the
firearms GONZALEZ sold was a machinegun, two of the firearms
were short-barreled rifles, and most of the firearms were
privately manufactured "ghost guns" bearing no manufacturer
markings or serial numbers.

    8.   **BEDARD** supplied firearms that GONZALEZ sold to the UC
and CI during four controlled transactions from November 2022 to
March 2023, based on law enforcement's observations of BEDARD
during a controlled transaction, Instagram messages between
BEDARD and GONZALEZ, and GONZALEZ's recorded statements.[2]  BEDARD
was present for one of these controlled transactions and
supplied a firearm to GONZALEZ to sell to the UC on that
occasion.  BEDARD and GONZALEZ communicated frequently with each
other via Instagram to facilitate the sale of firearms.[3]  BEDARD
also used his Instagram accounts to advertise the sale of
firearms, ammunition, and controlled substances to others,
offering to bring these items from Arizona to California.  From

---

[1] The CI has been compensated approximately $3,200 thus far
for his/her assistance in this investigation by the ATF.  Over
approximately the past six months, the CI has been paid
approximately a total of $4,900 for all the assistance s/he has
provided in ATF investigations.  The CI has a pending criminal
case in the Central District of California for firearms and drug
trafficking violations and has signed a cooperation agreement
with the USAO.  The CI has been active for approximately eleven
months and has consistently provided credible and reliable
information.

[2] Unless stated otherwise, all of the phone calls and
controlled transactions were audio and/or video recorded, and
all of the text messages were preserved.

[3] On April 25, 2023, the Honorable Patricia Donahue, United
States Magistrate Judge, issued a search warrant for BEDARD's
two Instagram accounts, "ten.toe.bedard" and "tentoeouthedoor."

the beginning of this investigation until approximately mid-April 2023, BEDARD resided in Arizona and transported firearms from Arizona to California for sale.

9.   **MALILAY** supplied firearms to GONZALEZ to sell to the UC or sold firearms directly to the UC during at least four controlled firearms transactions from March to May 2023.  In addition, MALILAY told the UC that he manufactured several of the firearms purchased by the UC and that MALILAY planned to manufacture additional firearms.

10.   **YBARRA** is a previously convicted felon who resides at SUBJECT PREMISES 1, based on California DMV records, commercial databases, phone records, rental agreements, eBay order information, and GONZALEZ's statements.  During controlled transactions in October 2022 and January 2023, GONZALEZ retrieved firearms to sell to the UCs and/or CI from SUBJECT PREMISES 1.  During a controlled transaction on April 20, 2023, YBARRA arrived at SUBJECT PREMISES 2 in a Ford F-150 pickup truck (which YBARRA had rented in his name, providing SUBJECT PREMISES 1 as his address).  YBARRA met with GONZALEZ inside the pickup truck, and then GONZALEZ walked over to the CI's car, got into the car, and sold a firearm to the UC and CI.  In addition, according to records obtained from eBay, YBARRA ordered firearms parts and accessories on eBay approximately 19 times between June 2021 and February 2023.  Based on my training and experience, the firearms parts and accessories, which were shipped to SUBJECT PREMISES 1, are often used to privately manufacture firearms.  YBARRA also ordered two machinegun

conversion devices (commonly referred to as "Glock Switches") from an online vendor in August 2021 and had them shipped in his name to SUBJECT PREMISES 1.

11.    Throughout this investigation, GONZALEZ used a phone number ending in x4274 (the "4274 number") to communicate with the UC and/or CI regarding firearms sales, send pictures and prices of firearms to the UC and/or CI, and arrange meeting times and locations for the firearms sales from approximately October 23, 2022, to June 21, 2023.  GONZALEZ also utilized the 4274 number to communicate with YBARRA and MALILAY before, during, and/or after various firearms transactions, often immediately before or after communicating with the UC and/or CI.

12.    Of the twelve firearms transactions, two occurred in front of or in the vicinity of SUBJECT PREMISES 1, where YBARRA resides.  Five transactions occurred inside or in front of SUBJECT PREMISES 2, GONZALEZ's residence.  The remaining five firearms transactions occurred in other locations.  MALILAY resides at SUBJECT PREMISES 3.

13.    **SUBJECT PREMISES 1:**  As described above, YBARRA resides at SUBJECT PREMISES 1.  On October 27, 2022, and January 24, 2023, GONZALEZ retrieved firearms from SUBJECT PREMISES 1, which GONZALEZ then sold to the CI and/or CI outside SUBJECT PREMISES 1.  Law enforcement observed GONZALEZ entering and exiting the front door area of SUBJECT PREMISES 1 multiple times during these transactions.  In addition, as described above, I believe that YBARRA supplied firearms that GONZALEZ sold to the UC and CI in November 2022 and April 2023.  YBARRA has also

7

ordered firearms parts, firearms accessories, and Glock switches from online vendors, which were shipped to SUBJECT PREMISES 1.

14. **SUBJECT PREMISES 2:** Based on my review of California DMV records, commercial databases, surveillance, and GONZALEZ's own statements, I believe GONZALEZ resides at SUBJECT PREMISES 2. On at least five occasions, GONZALEZ conducted firearms transactions with the UC and/or CI inside or in front of SUBJECT PREMISES 2.

a. GONZALEZ sold firearms to the UC and CI on November 22, 2022, December 12, 2022, and December 16, 2022, inside SUBJECT PREMISES 2.

b. During another firearms transaction on April 20, 2023, GONZALEZ introduced the UC and CI to MALILAY, who sold the UC a firearm inside SUBJECT PREMISES 2, and GONZALEZ then sold a second firearm to the UC outside SUBJECT PREMISES 2.

c. During a firearms transaction on May 18, 2023, MALILAY sold the UC six privately manufactured firearms inside SUBJECT PREMISES 1 in the presence of GONZALEZ.

15. **SUBJECT PREMISES 3:** MALILAY lives at SUBJECT PREMISES 3.[4] On March 2, 2023, after GONZALEZ sold five firearms stored in duffle bags to the UC and CI at a house at 720 W. Dante Drive, Santa Maria, California (the "Dante Drive Residence"), law enforcement observed MALILAY exit the front door area of the

---

[4] On March 12, 2023, the Santa Barbara Sheriff's Office ("SBSO") conducted a routine traffic stop of a Saturn SUV, which MALILAY was operating, in Lompoc, California. During the traffic stop, MALILAY told the SBSO deputy that he lived at SUBJECT PREMISES 3.

Dante Drive Residence holding a duffle bag and drive to the
building containing SUBJECT PREMISES 3.[5]

      a.   On April 20, 2023, MALILAY met with GONZALEZ, the
UC, and the CI at SUBJECT PREMISES 2.   Law enforcement observed
MALILAY arrive in a Ford Mustang which was registered to
MALILAY's mother at SUBJECT PREMISES 3.   MALILAY then sold a
firearm to the UC and told the UC that he manufactured the
firearm himself.   MALILAY also stated he had recently ordered
firearms parts and accessories and planned to order more in the
future.

      b.   On April 24, 2023, while conducting surveillance
in Lompoc, California, I observed MALILAY exit the building
containing SUBJECT PREMISES 3 and leave the area of SUBJECT
PREMISES 3 in the previously described Ford Mustang.

      c.   On May 18, 2023, while conducting surveillance in
Lompoc, California, SBSO Detectives observed MALILAY arrive
outside SUBJECT PREMISES 3 in the Ford Mustang.   Detectives then
observed MALILAY enter the building that contained SUBJECT
PREMISES 3, re-emerge carrying a backpack, and drive to SUBECT
PREMISES 2 to sell firearms to the UC, and CI.   SBSO Detectives
then followed MALILAY in the Ford Mustang, who eventually
returned to the area of SUBJECT PREMISES 3 and entered the
building.

---

[5] SUBJECT PREMISES 3 is Apartment #89 in the Fiesta
Apartments complex in Lompoc, California.   It is contained in
the southernmost building in the complex in the eastern end of
the building.   Apartment #89 has a wooden fence with an entryway
that leads only to it and Apartment #88 directly east of it.
This building will be referenced throughout this affidavit.

## IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

16.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  On October 27, 2022, GONZALEZ Sells a Machinegun to the CI Outside SUBJECT PREMISES 1**

17.  Beginning in or around October 2022, the CI identified GONZALEZ as a source of drugs and firearms, and ATF began investigating GONZALEZ for unlicensed firearms dealing and drug trafficking in Santa Barbara County, within the Central District of California.

a.  On or about October 22, 2022, GONZALEZ approached the CI and informed him/her that GONZALEZ's associate had recently acquired ten pounds of suspected methamphetamine.

b.  Following this, the CI contacted me and informed me of his/her conversation with GONZALEZ.  I then showed the CI an unmarked California DMV photograph of GONZALEZ and the CI confirmed this was the individual who approached him/her.

c.  At my direction, the CI to contacted GONZALEZ to see if GONZALEZ would be willing to sell methamphetamine to the CI.

18.  On or about October 23, 2022, GONZALEZ told the CI that one pound of methamphetamine would cost $1,650.  GONZALEZ and the CI then agreed to meet on October 26, 2022, to conduct their methamphetamine transaction.  When the CI contacted GONZALEZ regarding the methamphetamine transaction on October 26, 2022, GONZALEZ stated that he had "been texting him all

morning and calling him he hasn't replied to me yet." Based on my training and experience, I believe GONZALEZ was referring to his methamphetamine supplier. The planned methamphetamine transaction did not go forward.

19. Later that same day, GONZALEZ contacted the CI and told him/her that GONZALEZ had an AR-style rifle for sale. GONZALEZ sent the CI an image via text message depicting a black and red AR-style firearm. GONZALEZ and the CI agreed to a price of $1,700 for the firearm and a 100-round-capacity drum magazine.

20. Based on my review of phone calls and text messages, my conversations with other law enforcement officers, and my own observations, I learned that the following events occurred on October 27, 2022:

    a. The CI met me and another ATF Special Agent at a predetermined meeting location. The CI and the CI's car were searched for contraband, with negative results, and the CI was provided with documented government funds and electronic monitoring and recording equipment.

    b. After the CI contacted GONZALEZ via telephone, GONZALEZ told the CI via text message to go to 4823 Sanchez Drive in Guadalupe, California. Law enforcement followed the CI to the deal location and did not observe him/her make any unscheduled stops or contacts.[6]

---

[6] Unless otherwise stated, the steps of meeting the CI and/or UC at a predetermined meeting location, searching the CI for contraband, providing electronic monitoring and recording
*(footnote cont'd on next page)*

c.    Shortly after the CI arrived at the deal location, in the vicinity of SUBJECT PREMISES 1, GONZALEZ got out of a Nissan Sentra bearing California license plate number 5WWN568 and got into the CI's car.  After the CI gave GONZALEZ $1,700, GONZALEZ got out of the CI's car.  SBSO Detective Jamie Furber then observed GONZALEZ enter SUBJECT PREMISES 1.  A short while later, Detective Furber observed GONZALEZ re-emerge from SUBJECT PREMISES 1 with a black plastic bag and get back into the CI's car.  GONZALEZ removed a black and red AR-style firearm from the bag and told the CI the firearm had "tactical stuff, full-auto switch, double 100-round drum clip."  Based on my training and experience, I believe GONZALEZ was telling the CI that the firearm he possessed and sold to the CI was a machinegun with a high-capacity magazine.  GONZALEZ then got out of the CI's car and left the area.

21.    After the transaction concluded, I took custody of a privately manufactured, black and red, AR-style, .556 NATO caliber pistol, with no serial number or manufacturer markings, and a high-capacity drum magazine.  Based on a report from the ATF Firearms Technology Control Branch, an ATF Firearms Enforcement Officer determined this firearm to be a machinegun.

**B.    On November 16, 2022, GONZALEZ Sells Approximately 895 Grams of Methamphetamine to the UC and CI**

22.    In early November 2022, I directed the CI to inquire about purchasing methamphetamine from GONZALEZ.  On November 11,

_____

equipment and government funds to the CI and/or UC, and following the CI and/or UC to and from the deal location were repeated for each of the controlled purchases.

2022, GONZALEZ texted the CI, "Got the other stuff too if you want it the P 1650." In another text message a few days later, GONZALEZ told the CI, "The P I got that one for sure…The P is locked in at 1650." Based on my training and experience, I believe GONZALEZ was referring to a pound of methamphetamine.

23. On November 16, 2022, via text messages and phone calls, GONZALEZ told the CI to meet him at an apartment in Santa Maria, California, to conduct the methamphetamine deal. Based on my review of the electronic recordings, conversations with other law enforcement officers, and my own observations during the methamphetamine deal, I learned that the CI and UC met with GONZALEZ at the specified apartment and purchased approximately 437 grams of suspected methamphetamine, which was packaged in a heat-sealed plastic bag inside a gray plastic bag, from GONZALEZ for $1,700. During the transaction, the UC asked GONZALEZ if he could buy another pound of methamphetamine. GONZALEZ replied that he would make a phone call and have his supplier, Co-Conspirator 1, bring the methamphetamine over. The CI and UC then left the area.

24. Shortly after this, GONZALEZ called the CI and stated that GONZALEZ would have the additional pound of methamphetamine in about thirty minutes. The UC and CI returned to the apartment in Santa Maria. Agents and SBSO detectives observed GONZALEZ exit the apartment and get into the front passenger seat of a Toyota Camry, which Co-Conspirator 1 was driving. Moments later, GONZALEZ got out of the Camry carrying a white plastic Target bag and returned to the apartment.

25.   GONZALEZ then sold approximately 458 grams of methamphetamine, which was contained in two plastic bags inside a white Target bag, to the UC and CI for $1,700.

26.   Based on reports from the Drug Enforcement Agency ("DEA") Southwest Laboratory in Vista, California, the two packages contained approximately 437 grams and approximately 458 grams of actual methamphetamine, respectively.

**C.   On November 22, 2022, GONZALEZ Sells Three Firearms to the UC and CI Inside SUBJECT PREMISES 2**

27.   Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own observations, on or about November 11, 2022, through November 22, 2022, GONZALEZ communicated with the CI regarding firearms GONZALEZ had for sale.

a.   On November 11, GONZALEZ told the CI that he had "unlimited" firearms for sale.  The following day, GONZALEZ told the CI that he had a "modified Glock," and was "working on the rifles right now," and could possibly obtain an AK-style firearm for the CI.

b.   On November 15, GONZALEZ told the CI that he was still attempting to get an AR-style rifle, stating, "I found one guy who is trying to charge a shitload for one, but I have another homie who is gonna give me a really good price on it." Following this, GONZALEZ informed the CI that GONZALEZ had told his methamphetamine supplier that "this fool's been in the pinta for hella time G," referring to the CI.  Based on my training

14

and experience, and my knowledge of the Spanish language, I know that "pinta" is slang for prison.

c.    On November 16, 2022, GONZALEZ sent the CI an image via text message depicting a black and tan AR-style rifle and stated, "This one is going for 1650."

d.    On November 17, 2022, GONZALEZ sent the CI two images via text message depicting a privately manufactured, Glock-type pistol, with a gray frame and gold barrel, and one image depicting a black AR-style pistol.

e.    On November 18, 2022, GONZALEZ sent the CI an image of the black AR-style pistol via text message, stating "It's gonna be 1800 for this one"; another image of the black and tan AR-style rifle, stating, "And 1600 for this one"; additional images depicting the gray and gold Glock-type pistol, stating, "And 1400 for this one"; and an image of a black pump action shotgun, stating, "600 for the shotgun, 1400 for the custom Glock, 1650 for the AR, 1800 for the AR pistol that is from Arizona with a bump stock and shoots 7.62 with a 7 inch barrel.  Specifically modified for close quarter combat.  So the total would be 5,450."

f.    Following these messages, the CI and GONZALEZ discussed the prices of the firearms, with GONZALEZ stating, "The handgun is pricey because lowers are illegal in California now you can't get them here anymore.  There [sic] all clean and ghost.  I can drop $200 off the total but that's it."  Based on my training and experience, I believe GONZALEZ was telling the CI that the Glock-type pistol was a privately manufactured

firearm with no serial number and illegal to possess in California.  The CI agreed to meet with GONZALEZ on November 22, 2022, to conduct the firearms transaction.

28.  Between November 11, 2022 and November 22, 2022, GONZALEZ communicated with BEDARD via Instagram Direct Message about buying and selling firearms:[7]

a.  On November 11, 2022, GONZALEZ messaged BEDARD, "I need AR pistol or ar 15 looking to get it for at least 1200-1600."  BEDARD replied, "I got one…I got a ar pistol with 7.62 ak 47 rounds it shoots…1500 it's badass shoots fire on god…It's at my pad I'll send you a pic later…I can bring it next week or so too?"  Based on BEDARD's messages and my queries of Arizona DMV records and commercial databases, I believe BEDARD was residing in Arizona at the time.

b.  On November 14, 2022, GONZALEZ attempted to get BEDARD to lower the price of the firearm to $1,400 so that he could "flip it a little easier."  BEDARD then offered a price of $1,450, stating, "1450 meet in the middle cuz he will take 1400 and I gotta make some for bringing it to cali if you want 1400$ but when I land you gotta buy me a raw garden and an 1/8th from dispo cuz I miss cali."  Based on my knowledge of this investigation and my training and experience, I believe BEDARD

---

[7] GONZALEZ used an Instagram account with the username "jacobg_805," while BEDARD used an Instagram account with the username "ten.toe.bedard."  I know that GONZALEZ used the "jacobg_805" account based on the use of undercover Instagram accounts, my conversations with other law enforcement officers, my review of Instagram conversations between BEDARD and GONZALEZ, and my review of the contents of the referenced Instagram search warrant.

was saying that he had to buy the firearm from another
individual and wanted to be able to make enough money on the
firearm transaction if he was going to bring it from Arizona to
California.  I also believe BEDARD was using slang to ask
GONZALEZ to obtain marijuana for him when he arrived in
California.

      c.    BEDARD and GONZALEZ continued to negotiate the
sale of the AR-style firearm, with BEDARD requested a down
payment, stating, "Bc it's not mine but send me some money to
lock it in…but if you don't lock it who knows if he'll sel [sic]
it."  When GONZALEZ declined, BEDARD stated, "I can't bring it
to cali for no reason g that's hella illegal."

      d.    GONZALEZ then told BEDARD he would not purchase
the firearm from him, stating, "I'll see if I can find something
local cuz this ain't my money I'm flipping it as soon as I get
it."

      e.    In response, BEDARD suggested that GONZALEZ
"won't find a ar pistol with ak rounds," to which GONZALEZ
replied, "Ya I can that's why I have Ernesto build it for me."[8]
BEDARD responded, "When you see me in sm with the baddest mini
ar in town don't hmu trying to buy it then remember Ernesto the
great will build you it" and that nobody in Santa Maria had an
"AR pistol calibrated in 7.62 with a 7 inch [barrel], first off
these are illegal in cali second off you can't even caliber an
ar in cali to the spec…they easy asf to get here."  Based on my

---

    [8] Based on my knowledge of this investigation, I believe
GONZALEZ was referring to YBARRA when he mentioned that
"Ernesto" built firearms for him.

training and experience, I believe BEDARD was telling GONZALEZ
that AR-style firearms capable of firing AK-47 rounds were easy
to acquire in Arizona, as opposed to California, where they are
illegal.

      f.   BEDARD then told GONZALEZ, "You know I'm not in
cali you can't expect me to bring a whole ass strap[9] especially
an illegal one all that way for you and not make a dime…I've
only seen a few here and I'm in phoenix Arizona where I can buy
and sell guns with no damn paperwork needed."  BEDARD stated the
firearm belonged to his associate, but it was currently at
BEDARD's residence.

      g.   On November 16, 2022, BEDARD told GONZALEZ he
would bring the AR pistol with him that weekend, as his
associate had not yet sold it.  GONZALEZ then stated he would
have $1,400 ready for BEDARD for the firearm.

      h.   On November 18, 2022, referring to a series of
images of a shotgun that BEDARD had sent him, GONZALEZ asked,
"What's everyone offering you?"  BEDARD stated he was offered
$350, but GONZALEZ countered, "I got 400 cash for u so that's
1800 for both brother."  BEDARD stated, "I was only thinking
about bringing the shotty but I will if you serious."  Based on
my knowledge of the investigation, I believe that GONZALEZ was
offering to purchase a shotgun (referred to as a "shotty") from
BEDARD for $400 and that BEDARD would bring the shotgun to

---

    [9] Based on my training and experience, I know that "strap"
is common slang for firearms.

California if GONZALEZ was serious about purchasing it and the
previously described AR-style firearm for $1,800.

      i.   On November 19, 2022, BEDARD sent a message to
GONZALEZ stating, "Leaving phoenix rn get that dispo stuff ready
I got you 3 slugs for the shotty and an extra clip for the ar
with one clip full of bullets and I'm leaving to sm rn
brother!!"  Based on my training and experience, I know the
terms "slugs" and "clip" are common slang for shotgun shells and
firearm magazines.  Based on my knowledge of the investigation,
I believe that BEDARD was saying that he was traveling from
Phoenix, Arizona, to Santa Maria, California (referred to as
"sm"), that GONZALEZ should purchase marijuana for BEDARD, and
that BEDARD would bring with him the AR-style pistol, the
shotgun, three shotgun shells, and an extra, loaded magazine for
the AR-style pistol.

      j.   On November 20, 2022, at approximately 12:59
p.m., BEDARD informed GONZALEZ that he was in Santa Maria with
the firearms.  GONZALEZ confirmed that the price of the two
firearms was still $1,800.

      k.   On November 21, 2022, at approximately 1:06 p.m.,
GONZALEZ told BEDARD to "Come to my pad at like 3 ish… Bring a
blunt wrap," with GONZALEZ providing his address as SUBJECT
PREMISES 2.  Later that day, BEDARD messaged GONZALEZ stating
that he had arrived at GONZALEZ's residence.

      l.   On November 22, 2022, GONZALEZ messaged BEDARD
and claimed, "The safety doesn't work on the ar pistol…Wait nvm
so it works I'm burnt af…It won't work unless the clip is in."

BEDARD replied that, "It's not even a legal ar it has a stock…ar pistol not supose to…and also…it's not calibrated in 223 or 556 like regular Ars it's 7.62 that's ak 47 rounds."

29.    On November 22, 2022, GONZALEZ sold three firearms to the CI and the UC.

a.    That day, the CI contacted GONZALEZ via text message regarding the planned firearms transaction.  GONZALEZ confirmed that the transaction would take place later that day and sent the address of SUBJECT PREMISES 2 to the CI.  GONZALEZ then told the CI, "I have the Glock, ar pistol 7.62 fully metal I should be selling it for 2k alone I'm giving you a great deal on it.  And I have the shotty so altogether it will be 3,800."

b.    The UC and the CI then drove to SUBJECT PREMISES 2 to conduct the firearms transaction with GONZALEZ.  Upon arriving at SUBJECT PREMISES 2, law enforcement observed a white Acura parked in the driveway with an unidentified Hispanic male sitting in the driver's seat.  Upon querying California DMV registration records, law enforcement learned this car was registered to an individual at SUBJECT PREMISES 1.  When the UC and CI met with GONZALEZ outside SUBJECT PREMISES 2, GONZALEZ told the UC that the driver of the white Acura was, "My boy and he's coming in too.  He's the one with the Glock."  The UC and CI then entered SUBJECT PREMISES 2 through a side entrance, where GONZALEZ indicated his room was located, while GONZALEZ met with the driver of the white Acura.

c.    Once GONZALEZ entered SUBJECT PREMISES 2, he presented the UC and CI with a Glock-type pistol from his

20

waistband and pulled the covers back from his bed to reveal a shotgun and an AR-style pistol. GONZALEZ confirmed that the Glock-type pistol, shotgun, and AR-style pistol cost $3,800.

   d. GONZALEZ stated that he was working on obtaining more firearms and that he had access to "unlimited of these right now," referring to polymer-based, privately manufactured, Glock-type pistols. GONZALEZ stated, "We have a 3D printer and the file and been making them nonstop, selling them to you cheap." The UC then asked if he could purchase brand-name Glock pistols from GONZALEZ, and GONZALEZ told the UC he had an associate he grew up with in Arizona that could get them for him.[10]

   e. Following this, the UC gave GONZALEZ $3,800 for the three firearms. The UC, the CI, and GONZALEZ then exited SUBJECT PREMISES 2, and the UC and CI left the area. Law enforcement then observed GONZALEZ again meet with the driver of the white Acura, before returning to SUBJECT PREMISES 2. Law enforcement then observed the white Acura exit the driveway of SUBJECT PREMISES 2 and drive to SUBJECT PREMISES 1.

   30. I later retrieved the following firearms from the UC and CI: (1) an Anderson Manufacturing, model AM-15, 7.26x39mm caliber, AR-style pistol bearing serial number 20091863; (2) a privately manufactured Polymer80, model PF940C, pistol bearing no serial number; and (3) a Hawk Industries, Inc., model H&R Pardner Pump, 12-gauge shotgun, bearing serial number HW501673.

---

[10] Based on my knowledge of GONZALEZ's conversations with BEDARD over Instagram, I believe BEDARD was GONZALEZ's associate in Arizona.

I also retrieved three Federal 12-Gauge shotgun shells and twenty-seven rounds of assorted brand 7.62x39mm cartridges. Based on my knowledge of BEDARD and GONZALEZ's Instagram conversations, and GONZALEZ's own statements, I believe BEDARD transported the Hawk Industries shotgun and Anderson Manufacturing AR-pistol from Arizona to California and sold them to GONZALEZ, who subsequently sold them to the UC and CI.

### D.    On December 12, 2022, GONZALEZ Sells a Stag Arms Stag-15 Rifle to the CI Inside SUBJECT PREMISES 2

31.    Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own observations, during a conversation between GONZALEZ and the CI on or about November 23, 2022, GONZALEZ stated he could get the UC, "A quarter key of snow" for $7,800. Based on my training and experience and knowledge of this investigation, I believed GONZALEZ was using coded language to tell the CI that he could sell the UC a quarter of a kilogram of cocaine for $7,800.

32.    On December 8, 2022, the CI contacted GONZALEZ to inquire about what GONZALEZ had for sale. GONZALEZ told the CI he had, "Snow at a good price 7400 for the quarter key 8.8ozs." Following this, the CI asked about firearms, to which GONZALEZ replied, "OK [the UC] want another p? And yes always does [the UC] want glocks?" Based on my training and experience, I believe GONZALEZ was using coded language to ask the CI if the UC was interested in purchasing another pound (a "P") of methamphetamine or Glock firearms. GONZALEZ later stated, "I

got two glocks right now can do two for 9 each so 1800 for two…U want that .38 for 400?"

33.   On December 9, 2022, GONZALEZ told the CI, "I just talked to my boy that has the two glocks for 1800 and he told me some cat came and cashed him out for 2k each…I can get something else if [the UC] wants."   Based on my training and experience, I believe GONZALEZ was telling the CI that his firearms supplier sold the two firearms to another customer for $2,000 each. GONZALEZ then stated he could get an AR-style rifle and sent the CI an image depicting a black and tan AR-style rifle.   The CI and GONZLAEZ agreed to a price of $1,500 for the AR-style rifle, with GONZALEZ stating, "OK I'll text you when I have it."

34.   On December 11, 2022, GONZALEZ sent the CI a video of an individual manipulating a black AR-style rifle and told the CI the price of the firearm was $1,800 and that it was ".556 and .223" caliber.   The CI and GONZLAEZ then agreed on a price of $3,300 for the two AR-style rifles.   The following day, however, GONZALEZ informed the CI that he only had one of the firearms ready to sell.

35.   Later that day, the CI met with GONZALEZ at SUBJECT PREMISES 2.   GONZALEZ presented the CI with an AR-style rifle and stated, "I wish I could keep it for myself."   When the CI asked how GONZALEZ obtained firearms, GONZALEZ stated, "They come up when they come up, I just have to come across them." The CI then paid GONZALEZ $1,500 for the firearm and left SUBJECT PREMISES 2.

36.    I later recovered a Stag Arms, model Stag-15, multi-caliber rifle, bearing serial number S023003, from the CI and placed it into ATF custody.  I also recovered nine rounds of .223 caliber ammunition and a rifle magazine.  I later queried the California Automated Firearms System (AFS) with the manufacturer's information on this firearm and determined that the rifle was stolen in September 2021 in Lompoc, California.

**E.    On December 16, 2022, GONZALEZ Sells a Privately Manufactured Firearm to the UC and CI Inside SUBJECT PREMISES 2**

37.    Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own observations, GONZALEZ sent the CI multiple images depicting firearms during the evening of December 12, 2022.

38.    On December 13, 2022, GONZALEZ again contacted the CI via text message and stated, "I got this one for us…1800…556," and sent multiple videos to the CI.  One video depicted an unidentified individual with a white-sleeved shirt manipulating an AR-type pistol, with other pistols visible in the background. Another video showed an individual in a white hooded sweatshirt firing a firearm.  GONZALEZ then stated, "I can do the AR pistol and the Glock together as a package deal for you" for $2,800.

39.    On December 14, 2022, GONZALEZ contacted the CI via text message, stating, "I can get us 4 p80s for 3450."  Based on my training and experience, I know that the term "P80" is an abbreviation for Polymer80, a brand of firearms that are often privately manufactured.  Following this, during a phone call between the CI and GONZALEZ, GONZALEZ stated he could sell the

24

CI, "Four P80s, four Polymer80s, so four 9 millimeters." When the CI and GONZALEZ began to discuss the price of the firearms, GONZALEZ stated, "Tell him [the CI] 33 [$3,300], but tell him I told you 35 [$3,500] and you worked me down to 33." Based on my training and experience, I believe GONZALEZ was reading a message from one of his firearms suppliers, who told GONZALEZ what prices to charge the CI for the four firearms.

40. That same day, GONZALEZ contacted BEDARD via Instagram and asked whether BEDARD was coming to Santa Maria that weekend and whether GONZALEZ could buy "something" off him. BEDARD replied that he would not be traveling to Santa Maria until the following weekend but told GONZALEZ, "I got [this] pocket rocker rn for 1100 mp 9mm and when I get to town I am gon get a p80 I will hyu. I want 1200 for that tho built with good as parts." GONZALEZ replied, "I can't spend that much I'm about to get 4 p80s for 2800 brotha!"

41. On December 15, 2022, GONZALEZ again contacted the CI and told the CI he only had one firearm available at the moment, stating, "The 4 p80s are supposed to be landing any day this weekend as far as my guy told me." The CI and GONZALEZ then agreed to meet the following day.

42. On December 16, 2022, the UC and CI met with GONZALEZ inside SUBJECT PREMISES 2. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own observations, I know that the following occurred during the meeting:

a.    GONZALEZ pointed to an AR-style pistol near the door and indicated to the UC that the firearm, which had been successfully fired by its previous owner, was for sale for $1,800.  The UC paid GONZALEZ $1,800 for the AR-style pistol.

b.    GONZALEZ told the UC that the Polymer80 pistols they had previously discussed were supposed to arrive by the end of the week, and that the source of the Polymer80 pistols had access to a 3D printer and would be manufacturing more firearms. GONZALEZ also stated that his associate in Arizona had a firearm for sale but was asking too much for the firearm.  GONZALEZ stated he had a better deal for firearms with an individual connected to F Street gang members in Lompoc, California.

c.    The UC asked GONZALEZ if his firearms supplier could make firearms fully automatic.  GONZALEZ replied he was trying to obtain a firearm with a machinegun conversion device on it, and that he could take it off and sell it to the UC.

d.    GONZALEZ stated he would attempt to get the rest of the firearms discussed by the weekend.  The UC and the CI then left SUBJECT PREMISES 2.

43.  I later recovered a privately manufactured AR-style, .223 caliber, pistol, bearing no serial number, from the UC and placed it into ATF custody.

**F.    On January 9, 2023, GONZALEZ Sells Two Firearms Supplied by BEDARD and an Unidentified Individual to the CI**

44.  Based on my review of law enforcement reports, my conversations with other law enforcement officers, and my own observations, on December 19, 2022, GONZALEZ, using Instagram

account "jacobg_805," replied to an Instagram Story on BEDARD's Instagram account, "ten.toe.bedard," which showed an image with text stating, "3 P80s 9mm, 2mp shield 9mm, 1 Toro 9mm and ar pistol 556 tap in deal on all of them." GONZALEZ asked BEDARD for the prices of all of the firearms. BEDARD then told GONZALEZ to provide BEDARD's phone number to GONZALEZ's firearms customer (the CI and/or the UC), stating "No need to middle man." GONZALEZ replied, "I'm tryna make some $$$...If I send him to u I'll be losing my best customer…U realize the middle man makes a lot of money but that's why people don't like the middle man."

45. On December 23, 2022, BEDARD sent an Instagram Direct Message to GONZALEZ stating, "I'm getting a ar pistol rn badasssss asf but if I sell you it I need you to hold onto it for a lil while…Or would you needs flip it right away? Cuz I can't have it hit the streets right away." GONZALEZ then stated, "I think I can hold on to it for you and if ima flip it ill lyk right before I do."

46. On the same day, GONZALEZ replied to one of BEDARD's Instagram Story video posts, in which BEDARD could be seen wearing blue and white patterned shorts, and asked BEDARD to send him more pictures of the firearm he was selling. BEDARD replied, "Okay when I stop at a rest stop I will and I got one p80 and a 9mm mp shield and got 1 more p80 in town rn and I got a p80 top and bottom and everything bu the inside part…and I got a bad ass ruger converted to glock mags ar pistol baddass asf it was expensive tho its dope asf." GONZALEZ replied, "When you

get to town let's just say your (sic) gonna have stacks waiting for you…drive safe." Based on my training and experience, I know "stacks" to be a slang term for cash.

47. On December 24, 2022, GONZALEZ sent a Direct Message to BEDARD via Instagram, stating, "You never sent me pics." BEDARD replied, "I know it might be sold", referring to a firearm. Later, GONZALEZ asked BEDARD, "U got some blammers for me send some pics and prices…Hurry up so I can send the pics ot my guy." Based on my training and experience, I know "blammers" to be a slang term for firearms. Following this, BEDARD sent GONZALEZ several images of a black Ruger PC Charger pistol with a white and red Ruger cardboard box in the lap of an individual wearing blue and white patterned shorts. GONZALEZ replied, "Ain't gonna spend 2k on that bro."

48. Later that day, BEDARD posted an Instagram Story with an image depicting what appeared to be the same Ruger PC Charger pistol with a white and red Ruger cardboard box next to blue and white patterned shorts. The image contained overlayed text which read, "15 takes it." Following this, GONZALEZ replied to BEDARD's Instagram Story post and questioned why BEDARD previously quoted a price of $2,000 for the firearm to GONZALEZ.

49. On the same day, GONZALEZ sent the CI several images depicting a black, AR-type pistol (later identified as a Ruger PC Charger 9mm caliber pistol) in the hand and lap of an individual wearing blue and white patterned shorts, with a white Ruger box in the background. Based on my review of BEDARD's

28

Instagram account and my knowledge of this investigation, I
believe this individual to be BEDARD.

50.   From December 25, 2022, to December 26, 2022, BEDARD
and GONZALEZ communicated via Instagram regarding the price of
the Ruger PC Charger pistol (which they referred to as an "AR
pistol") and two Polymer80 pistols.  They eventually agreed on a
price of $3,200 for all three pistols, but BEDARD later told
GONZALEZ that BEDARD could not wait to sell the firearms until
after the New Year.

51.   Between December 27, 2022, and December 29, 2022,
BEDARD informed GONZALEZ that the "big one," referring to the
Ruger PC Charger pistol, was still available for sale.  On
December 31, 2022, BEDARD, using Instagram account
"tentoeoutthedoor," contacted GONZALEZ, who continued to use the
same Instagram account but with a new username, "jacob_f36," to
inform GONZALEZ that BEDARD had created a new Instagram account.

52.   On December 28, 2022, GONZALEZ sent additional images
of firearms to the CI.  One of these images depicted three
pistols on the lap of an individual wearing dark pants with a
bedazzled and studded belt.  One pistol was black with "P80" on
the grip and had the text ".40" overlayed on it, which based on
my training and experience I believe refers to .40 caliber.  A
second pistol was black and had the text ".45" overlayed on it,
which I believe refers to .45 caliber.  The third pistol was
black and tan with "P80" on the grip and had the text "9mm"
overlayed on it, which I believe refers to 9mm caliber.  I also
observed multiple firearm magazines in the image.  The image

29

itself appeared to be a screenshot from a cellular phone, based on the timestamp in the upper left corner and the cellular service strength bar and battery level in the upper right corner. After reviewing BEDARD's Instagram account, "ten.toe.bedard," I discovered an Instagram Story post from December 28, 2022 at approximately 8:11 p.m. which contained the same image.

53. Between January 2 and January 3, 2023, GONZALEZ and the CI communicated via text message about the firearms GONZALEZ had for sale. GONZALEZ stated, "There is like around 10 straps in total…it's gonna be around 1100 each and for the big one 1600 and for that big ass one like 1800."

54. GONZALEZ subsequently agreed to sell two pistols to the CI. GONZALEZ sent the CI an image of the previously described Ruger PC Charger 9mm pistol, which he agreed to sell the CI for $1,600. GONZALEZ also agreed to sell a Polymer80 pistol (which GONZALEZ referred to as a "Glock 43") to the CI for $1,000.

55. On January 8, 2023, GONZALEZ told the CI that each of the two firearms would be supplied by a different individual. GONZALEZ further stated, "I know both of them personally and grew up with them everything will go nice and smooth like it always does." GONZALEZ and the CI agreed to conduct the firearms transaction on the following day.

56. On January 9, 2023, GONZALEZ sent an Instagram Direct Message to BEDARD, stating, "My dude coming to town bro plz be ready or this gonna make me look hella bad." Based on my

knowledge of this investigation, I believe GONZALEZ was
referring to the planned sale of firearms to the CI.  Following
this, BEDARD provided his phone number to GONZALEZ.

57.  On January 9, 2023, GONZALEZ asked the CI to meet him
at an apartment in Santa Maria, California, to conduct the
firearms transaction.  Upon arriving outside the apartment, the
CI contacted GONZALEZ, and GONZALEZ stated that his "homie"
would be arriving shortly.  A few minutes later, GONZALEZ
confirmed that his associate had arrived.  GONZALEZ told the CI
in a phone call that he was parked in a "Beamer," which ATF
Special Agent Bryan Traverso identified as a 2016 BMW 4-Series
sedan bearing California license plate number 8JDW258.[11]
GONZALEZ stated that his associate would drive to where the CI's
car was parked to conduct the firearms transaction.

58.  Shortly after this phone call, SA Traverso observed
BEDARD get out of a white Audi SUV with a temporary paper
license plate and get into GONZALEZ's BMW.[12]  BEDARD was wearing
a salmon-colored sweatshirt and carrying a white cardboard box
with red lettering.  I later showed SA Traverso an unmarked
Arizona DMV photograph of BEDARD, and SA Traverso confirmed that
BEDARD was the individual he observed carrying the white
cardboard box and driving the white Audi.

---

[11] According to DMV registration records, this car is
registered to GONZALEZ at SUBJECT PREMISES 2.

[12] I later queried Arizona DMV vehicle registration records
and determined that BEDARD had a 2019 white Audi Q3 SUV
registered in his name.  At the time of the transaction, the
Audi Q3 had a temporary Arizona license plate permit.

59.  SA Traverso observed the BMW drive a short distance in the parking lot to where the CI was parked.  GONZALEZ then called the CI and told the CI he would get the money from the CI, return to his BMW, and then bring the firearm to the CI, stating, "It's right here in the car now," referring to the firearm.  When GONZALEZ got into the front passenger seat of the CI's car, the CI handed GONZALEZ $1,600, which GONZALEZ confirmed was for the "AR pistol."  GONZALEZ got out of the CI's car and returned a short while later carrying a white cardboard box with "RUGER" in red lettering.  GONZALEZ got into the CI's car and gave the CI the box containing the firearm.  GONZALEZ then told the CI, "The next one [firearm transaction] we're gonna meet down the street.  Lemme get this fool out of here." Soon after this, I observed the white Audi exit the area of the deal location.  At approximately the same time, SA Traverso observed a white work truck with a Pacific Petroleum logo drive up behind GONZALEZ's BMW.  The truck then sped out of the area.

60.  Following this, GONZALEZ directed the CI to another location for the next firearm transaction.  GONZALEZ stated, "We're going to his job right here…Pacific Petroleum."  The CI then followed GONZALEZ to the next deal location while law enforcement conducted surveillance.  At the new location, GONZALEZ got out of his car, got into the CI's car, and stated, "Probably feels like we were gonna kill you huh?" when commenting on the remoteness of the deal location.  According to the CI, the CI then gave GONZALEZ $1,000.  GONZALEZ got out of the CI's car, met with the driver of the Pacific Petroleum

truck, and returned a short while later to the CI's car with a blue plastic case containing a Polymer80 pistol.  GONZALEZ emptied the pistol onto his lap and asked the CI to grab the pistol.  Following this, GONZALEZ got out of the CI's car, and the CI left the deal location.

61.  I later retrieved a Ruger PC Charger, 9mm caliber, pistol, bearing serial number 913-41316, and a privately manufactured Polymer80, model PF9SS, 9mm caliber pistol, bearing no serial number, from the CI and placed the two firearms into ATF custody.  I also retrieved one round of Blazer 9mm Luger ammunition.  I examined the Ruger pistol and the white cardboard box with red "RUGER" lettering and determined that they were the same or very similar to the firearm and box depicted in the images GONZALEZ sent the CI, and the images BEDARD sent GONZALEZ.

G.  **On January 24, 2023, GONZALEZ Sells Approximately 399 Grams of Methamphetamine to the UC**

62.  On January 24, 2023, at my direction, the CI called and messaged GONZALEZ and, using coded language, asked to purchase a "P," referring to one pound of methamphetamine. During the call, GONZALEZ told the CI, "It's at your disposal, it's ready when you're ready."  When the CI asked for the price of the pound of methamphetamine, GONZALEZ stated, "1650, same price as last time."  GONZALEZ then directed the CI to come to SUBJECT PREMISES 2, stating, "I just go[t] the confirmation, everything is already in line.  If you can get to my house with the cash in Guad then it'll be here to us within 15 minutes."

63.   When the CI and UC arrived outside SUBJECT PREMISES 2, GONZALEZ got into the CI's car.  GONZALEZ then placed a phone call in the presence of the CI and UC, and asked, "Just seeing where you're at bro…so like eight minutes."  GONZALEZ then told the UC that GONZALEZ's methamphetamine supplier was less than eight minutes away.  A few minutes later, GONZALEZ received another phone call and directed the caller to park in front of SUBJECT PREMISES 2.

64.   Following this, SBSO detectives observed the previously identified Toyota Camry arrive in the area of SUBJECT PREMISES 2.  The UC observed a younger Hispanic male sitting in the driver's seat of the Camry, whom the UC later identified as Co-Conspirator 2.  The UC gave GONZALEZ $1,750 for the methamphetamine and for arranging the deal.  GONZALEZ got out of the CI's car, got into the Camry, and then returned to the CI's car with a black plastic bag containing methamphetamine in a heat-sealed plastic bag.

65.   According to a report from the DEA Southwest Laboratory, the heat-sealed plastic bag contained approximately 399 grams of pure methamphetamine.

**H.    On January 24, 2023, GONZALEZ Sells Two Firearms to the UC and CI Outside SUBJECT PREMISES 1**

66.   During the controlled methamphetamine transaction on January 24, 2023, the UC and GONZALEZ discussed conducting a firearms transaction later that day.  At approximately 12:32 p.m., GONZALEZ called an unidentified individual in the presence of the UC and stated, "My guys are in town right now, they're

getting something off me already, but I told them you have a bunch ready to go, so if they're good they'll get 'em today…3 ready to go? Okay, and what are those, the one that you sent me right? The AR and then the two smaller ones? Okay so two small ones and the big one." According to call detail records for GONZALEZ's phone number (the "4274 number"), GONZALEZ called a phone number ending in x9235 (the "EY number"), which is subscribed to YBARRA at SUBJECT PREMISES 1, at around 12:32 p.m.[13]

67.   During a call later that day, GONZALEZ told the CI that he had just spoken to his firearms supplier, who "has the AR for sure, and then he has the revolver for sure, and he has another Glock that he has to finish building." GONZALEZ told the CI that the AR-type rifle would cost $1,800 and the revolver would cost $850. According to call detail records for the 4274 number, GONZALEZ called the EY number shortly before contacting the CI to inform him/her about the firearms available for purchase.

68.   GONZALEZ called the CI again and asked if the CI and UC were ready to conduct the firearms transaction, directing them to come to Guadalupe, California. GONZALEZ then sent text messages to the CI stating, "4844 Sanchez Drive" and, "Park a few houses down." Based on my knowledge of this investigation, I know that 4844 Sanchez Drive is directly next to SUBJECT

---

[13] On January 10, 2023, the Honorable Jacqueline Chooljian, United States Magistrate Judge, issued a Pen Register and Trap and Trace Order for the 4274 number. On March 9, 2023, the Honorable Michael Wilner, United States Magistrate Judge, issued an extension of the existing order.

PREMISES 1.  According to call detail records for the 4274
number, GONZALEZ called the EY number again before directing the
CI to come to Guadalupe, California.

69.  At approximately this time, SBSO Detective Brian Scott
and ATF SA Traverso observed GONZALEZ's BMW parked in the
vicinity of SUBJECT PREMISES 1.  When the UC and CI arrived
outside SUBJECT PREMISES 1, GONZALEZ got into the CI's car.
Following a conversation about the firearms, the UC gave
GONZALEZ $2,650.  GONZALEZ got out of the CI's car and walked
towards the entrance of SUBJECT PREMISES 1.  Shortly thereafter,
GONZALEZ re-emerged from the area of SUBJECT PREMISES 1 carrying
a black bag, returned to the CI's car, and handed the UC a
privately manufactured AR-type rifle bearing no manufacturer's
markings, and a Sturm, Ruger and Co. GP100, .357 magnum caliber,
revolver bearing serial number 171-83122.

70.  After the transaction concluded, I recovered both of
these firearms from the UC and placed them into ATF custody.  I
recognized the Sturm, Ruger and Co. GP100 revolver from an image
GONZALEZ sent to the CI on January 9, 2023.  The image depicted
a brown and black Sturm, Ruger and Co. GP100 revolver on a case
with a partially visible black, Glock-type pistol in the left
side of the image.[14]

---

[14] In early January 2023, at my direction, the CI contacted
BEDARD via his Instagram account, "tentoeoutthedoor," using a
fictitious Instagram account.  The CI provided BEDARD with
his/her phone number.  On January 9, 2023, BEDARD called the CI
and discussed the firearms he had for sale, stating he had
"ghost guns" and "factory ghost" that were "unregistered."
BEDARD offered to send the CI "pictures and prices."  Later that
*(footnote cont'd on next page)*

### I.    On February 24, 2023, GONZALEZ Sells a Firearm to the UC and CI

71.    Based on my review of phone calls and text messages, my conversations with other law enforcement officers, and my own observations, between February 21, 2023, and February 24, 2023, the UC communicated with GONZALEZ to arrange the purchase of firearms.

72.    On February 24, 2023, GONZALEZ sent the UC text messages containing images of a black 1911-style pistol with blue and silver custom decals on the grip, and a black and silver AR-style pistol.  GONZALEZ then stated, "These r here right this second…But the rest will be here later hopefully." Following this, GONZALEZ called the UC and told the UC to meet him at the Dante Drive Residence to conduct their firearms transaction, stating the firearms were located there.  The UC and CI then drove to the Dante Drive Residence in the CI's car. During this time, law enforcement observed several cars parked near the Dante Drive Residence, including a Saturn SUV bearing California license plate number 6YVS949.  I later queried California DMV registration records and determined that the Saturn SUV was registered to MALILAY at the time.

---

day, BEDARD sent the CI several messages detailing the firearms he had available for sale, one of which contained an image of a black revolver with a brown grip, which I recognized as a Sturm, Ruger and Co., model GP100, .357 caliber revolver lying on a case with a partially visible black, Glock-type pistol on the left side of the image.  BEDARD then stated, "My boy wants 950 for this .357."  I believe this was the same image GONZALEZ had sent to the CI earlier that evening, and the same pistol the UC had purchased from GONZALEZ in front of SUBJECT PREMISES 1 on January 24, 2023.

73.    SBSO Sergeant Matthew Banks and the UC observed GONZALEZ exit the Dante Drive Residence carrying a duffle bag and get into the CI's car.  GONZALEZ sold a privately manufactured AR-type pistol bearing no manufacturer's markings to the UC for $1,800.  During the controlled purchase, GONZALEZ told the UC that the firearm was from his associate in Lompoc, who was affiliated with the F Street criminal street gang. Following the controlled purchase, I recovered the firearm from the UC and placed it into ATF custody.

74.    Shortly after this, I spoke with detectives with the Lompoc Police Department ("LPD") Gang Enforcement Unit regarding the registered owners of the cars parked near the Dante Drive Residence during the controlled transaction.  LPD Detective David Magaña informed me that MALILAY was known to them as an F Street gang member.

**J.    On February 24, 2023, GONZALEZ Sells Approximately 2,191 Grams of Methamphetamine to the UC**

75.    During the controlled firearms transaction on February 24, 2023, the UC asked GONZALEZ if he could obtain five pounds of methamphetamine for $1,100 to $1,200 per pound.  GONZALEZ told the UC he would call his methamphetamine supplier and check if that was possible.

76.    Later, GONZALEZ called the UC and stated that he could sell five pounds of methamphetamine to the UC for $1,200 per pound.  After the UC agreed to this price, GONZALEZ told the UC that his source of supply for the methamphetamine would have the methamphetamine ready by 3:00 p.m. that day.

38

77.    Later that day, the UC and CI drove to the Dante Drive Residence to purchase methamphetamine from GONZALEZ.  When the UC and CI arrived, GONZALEZ got into the CI's car.  GONZALEZ told the UC that the source of supply for the methamphetamine would be arriving shortly.  GONZALEZ then received a phone call at approximately 3:11 p.m. and told the UC, "There he is."

78.    At the same time, law enforcement observed the previously identified Toyota Camry arrive in the area of the Dante Drive residence.  The UC observed Co-Conspirator 2 in the driver's seat of the Camry.  The UC gave GONZALEZ $6,000 for the methamphetamine, and GONZALEZ exited the CI's car.  Law enforcement then observed GONZALEZ get into the front passenger seat of the Camry, and the Camry drive a short distance away.  Moments later, the Camry returned to the CI's vehicle, and GONZALEZ got out of the Camry carrying a cardboard diaper box.  GONZALEZ got into the CI's vehicle with the diaper box, which contained five plastic bags of methamphetamine, and provided it to the UC.  GONZALEZ then got out of the CI's car and returned to the area of the Dante Drive residence.

79.    According to a report from the DEA Southwest Laboratory, the five plastic bags contained approximately 2,191 grams of pure methamphetamine.[15]

---

[15] On March 29, 2023, GONZALEZ used the x4274 number to broker the sale of approximately 893 grams of suspected methamphetamine between Co-Conspirator 2 and the CI for $3,300 in Santa Maria.  GONZALEZ is believed to have been in Las Vegas, Nevada, at the time of the drug transaction.

**K.    On March 2, 2023, GONZALEZ Sells Five Firearms to the UC**

80.    Based on my review of phone calls and text messages, my conversations with other law enforcement officers, and my own observations, the UC and GONZALEZ communicated regarding additional firearms transactions between February 28, 2023, and March 2, 2023.    GONZALEZ sent multiple images of privately manufactured Glock-type pistols, AR-type rifles, and AR-type pistols to the UC.    GONZALEZ and the UC agreed to meet on March 2, 2023, outside the Dante Drive Residence.

81.    According to call detail records for the 4274 number, at approximately 10:10 a.m. on March 2, 2023, GONZALEZ called a phone number ending in x2444 (the "KM Number"), which is subscribed to MALILAY.    Immediately after this call, GONZALEZ called the UC, and two minutes later he called the KM Number again.

82.    SBSO and Santa Maria Police Department ("SMPD") Detectives observed several cars parked outside the Dante Drive Residence on March 2, 2023, including GONZALEZ's BMW and a burgundy Acura SUV bearing California license plate number 6WYG966.    Upon querying California DMV registration records, I determined that the Acura SUV was registered to A.R., who based on my conversations with LPD detectives is MALILAY's mother.

83.    At approximately 11:12 a.m., the UC arrived outside the Dante Drive Residence.    Law enforcement officers observed GONZALEZ exit SUJBECT PREMISES 3 carrying two duffle bags and get into the UC's car.    GONZALEZ then sold five privately

manufactured firearms (including one short-barreled rifle) to
the UC for $8,100.

84.    GONZALEZ stated that the five firearms came from his
associate in Lompoc.  GONZALEZ further described his firearms
supplier as an F Street gang member who was only twenty years
old and had previously been charged with attempted murder.
Based on my knowledge of this investigation and my review of
MALILAY's criminal history, I believe that GONZALEZ was
describing MALILAY as the source of the firearms.[16]  GONZALEZ
then got out of the UC's car, and the UC left the area.

85.    I later retrieved the following privately manufactured
firearms, with no serial numbers, from the UC and placed them
into ATF custody: (1) a gray and black, AR-type, .223 caliber,
rifle; a gray, black, and tan AR-type, .223 caliber, pistol; a
black AR-type, .223 caliber, pistol; a silver and gray AR-type,
.223 caliber, pistol; and a silver and black AR-type, .223
caliber, pistol.  I measured the barrel length of the privately
manufactured AR-type rifle and determined the barrel length to
be approximately 7.75 inches in length.

86.    Following the controlled purchase, law enforcement
officers observed MALILAY exit the Dante Drive Residence
carrying a duffle bag, get into the Acura SUV, drive to the area

---

[16] MALILAY was 18 years old at the time.  According to a
copy of MALILAY's Interstate Identification Index from the
California Department of Justice, LPD arrested MALILAY for First
Degree Murder, 187(A) PC, on or around July 30, 2020.  According
to LPD Detectives, the Santa Barbara District Attorney's Office
did not file a case against MALILAY, and the investigation is
still pending.

of SUBJECT PREMISES 3, and enter the building containing SUBJECT PREMISES 3.

**L.    On March 22, 2023, GONZALEZ and MALILAY Sells Four Firearms to the UC and CI**

87.    Based on my review of phone calls and text messages, my conversations with other law enforcement agents, and my own observations, between March 2, 2023, and March 21, 2023, GONZALEZ sent the UC multiple text messages with images of privately manufactured silver and black AR-type pistols, privately manufactured Glock-type pistols of various colors, a black AR-type rifle, and a Ruger .380 caliber pistol.  GONZALEZ and the UC agreed to conduct a firearms transaction on March 22, 2023.

88.    According to call detail records for the 4274 number, GONZALEZ exchanged multiple calls and messages with the KM Number before the planned firearms transaction.  Many of these contacts occurred shortly before or shortly after GONZALEZ was in contact with the UC.

89.    On March 22, 2023, GONZALEZ asked the UC to meet outside the Dante Drive Residence to conduct the firearms transaction, but the UC asked GONZALEZ to meet him/her at a business in Santa Maria instead.

90.    Prior to the controlled purchase of firearms, law enforcement conducted surveillance outside the Dante Drive Residence.  SBSO Sergeant Banks observed multiple cars parked close to the Dante Drive Residence, including a Toyota Camry bearing California license plate number 8ZEB624.  According to

California DMV registration records, the Toyota Camry is registered to MALILAY's mother.  Sergeant Banks also observed multiple individuals exit the Dante Drive Residence, including GONZALEZ, an individual later identified as MALILAY, and two other males.  Sergeant Banks observed that MALILAY was carrying a blue duffle bag, which he placed into the rear driver's side seat of the Toyota Camry.  MALILAY got into the driver's seat of the Camry, and an unidentified male got into the front passenger seat.  GONZALEZ and the other unidentified male got into a gray Jeep SUV bearing California license plate number 9EZF547.  According to California DMV vehicle records, the Jeep was registered to G.S.S.  Both cars then left the area.

91.  Law enforcement followed both cars to a business in Santa Maria, where the UC had arranged to meet with GONZALEZ.  When he arrived, GONZALEZ retrieved a blue duffle bag from the Toyota Camry, which was being driven by MALILAY.  GONZALEZ then got into the CI's car and sold four firearms and assorted firearms magazines to the UC for $5,800.  During the controlled purchase, the UC and GONZALEZ discussed conducting an additional firearms transaction from GONZALEZ's firearms supplier in Guadalupe later that day.  Based on my knowledge of this investigation, I believe GONZALEZ was referring to YBARRA as his Guadalupe firearms supplier.  All parties then left the area of the deal location.

92.  Law enforcement then surveilled MALILAY driving the Toyota Camry around Santa Maria and Guadalupe.  Eventually, a marked SBSO patrol car attempted to conduct a traffic stop on

the Toyota Camry while driving on Southbound Highway 135 towards Lompoc, California.  Upon observing the marked SBSO patrol car, MALILAY accelerated and fled from the SBSO patrol car in the direction of Lompoc.[17]

93.  I later retrieved the firearms and magazines from the UC and placed them into ATF custody, including: a short-barreled, privately manufactured rifle; a privately manufactured AR-type pistol; a Ruger LCP, .380 ACP caliber pistol with an obliterated serial number; and a privately manufactured Polymer80 pistol.  I then measured the length of the barrel of the short-barreled rifle and determined it to be approximately 6.25 inches in length.

94.  Later that day, I examined the Ruger LCP pistol with an obliterated serial number.  Using a fictitious Instagram account to view BEDARD's "tentoeouthedoor" Instagram account, I located a video posted to BEDARD's Instagram Story on the afternoon of March 21, 2023, depicting an individual handling a black Ruger LCP, .380 ACP caliber pistol, with a possibly obliterated serial number.  The video contained overlayed text, which read, "On the market it'll go fast" and, "SANTA MARIA CA." Based on this video, my review of the search warrant returns for BEDARD's Instagram accounts, and my examination of the Ruger LCP, .380 ACP caliber pistol which the UC purchased, I believe

---

[17] On March 12, 2023, SBSO Deputy T. Dunn conducted a traffic stop in Lompoc, California, on the previously described Saturn SUV bearing California license plate number 6YVS949.  SBO Deputy Dunn identified the driver of the Saturn SUV as MALILAY, who told Deputy Dunn that his residential address was SUBJECT PREMISES 3.

BEDARD supplied GONZALEZ with the Ruger LCP pistol, which GONZALEZ then sold to the UC on March 22, 2023.

**M.   On April 20, 2023, GONZALEZ Sells Firearms Supplied by MALILAY and YBARRA to the UC at SUBJECT PREMISES 2**

95.   Based on my review of phone calls and text messages, my conversations with other law enforcement officers, and my own observations, between April 14, 2023, and April 19, 2023, the UC communicated with GONZALEZ to arrange to purchase additional firearms.  GONZALEZ sent the UC text messages offering to sell Glock pistols for $1,300 each, images of two short-barreled, privately manufactured, AR-type rifles (stating they were "1500 a piece"), and an image of a black Sig Sauer pistol.  When the UC asked GONZALEZ what he would be selling, GONZALEZ replied, "Sig is gone, but I got a ton of g men for you."  Based on my training and experience, I know "g men" to be a slang term for Glocks.  GONZALEZ and the UC then agreed to conduct a firearms transaction on April 20, 2023.

96.   On April 20, 2023, SBSO Sergeant Banks observed GONZALEZ arrive at SUBJECT PREMISES 2 in his BMW sedan.  The UC and CI arrived at SUBJECT PREMISES 2 shortly thereafter and met with GONZALEZ inside and outside SUBJECT PREMISES 2.  A short while later, Sergeant Banks observed a black Ford Mustang bearing California license plate number 9EZF693 arrive in the area of SUBJECT PREMISES 2, which according to California DMV records was registered to MALILAY's mother at SUBJECT PREMISES 3.

97.  MALILAY got out of the front driver's seat of the Ford Mustang and met with GONZALEZ.  GONZALEZ then introduced MALILAY to the UC and CI.  MALILAY showed off his Ford Mustang, which he claimed he had recently obtained, by revving the engine for the UC, CI, and GONZALEZ.  All four individuals then entered SUBJECT PREMISES 2.

98.  While inside SUBJECT PREMISES 2, MALILAY told the UC that the metal AR-style firearms that the UC had purchased from GONZALEZ in March 2023 were from MALILAY and that MALILAY's associate had manufactured some of the privately made firearms. MALILAY stated that he and his associate had personally tested the firearms.  MALILAY told the UC that his associate taught MALILAY how to manufacture firearms, that they would make approximately 10 firearms at a time, and that they were currently waiting on additional upper receivers to complete more firearms.  MALILAY stated that a 7.62 caliber AR-style firearm would cost $1,200 and a 5.56 caliber AR-style firearm would be $1,000.  MALILAY then explained that he was obtaining lower receivers for AR-style firearms from Nevada and Texas and was waiting on a new shipment of parts.

99.  Following this, MALILAY removed a privately manufactured Polymer80 PF45, .45 caliber, pistol from his front right pants pocket and handed it to the UC.  MALILAY stated that the firearm was $1,200 and that the magazine had to be loaded in the firearm for it to fire.  MALILAY claimed that he shot the firearm from a car while driving on the Northbound US 101 freeway from Santa Barbara.

46

100. Next, MALILAY showed the UC a .40 caliber Glock pistol with an extended magazine, which he produced from his waistband. The UC attempted to buy MALILAY's Glock pistol but MALILAY declined to sell it to the UC. The UC then gave MALILAY $1,200 for the Polymer80 pistol, exited SUBJECT PREMISES 2, and returned to the CI's car. GONZALEZ told the UC and CI that another firearms supplier would be arriving shortly, and MALILAY exited SUBJECT PREMISES 2 and left the area in his Ford Mustang.

101.   A short while later, SBSO Detectives and I observed a white Ford F-150 pickup truck bearing California license plate number 32039D3 arrive outside SUBJECT PREMISES 2.  GONZALEZ got into the front passenger seat of the Ford F-150 and met with the driver, whom the UC and I later identified as YBARRA.  GONZALEZ then got out of the Ford F-150, walked over to the CI's car, and got into the rear passenger seat of the CI's car.

102. Upon entering the CI's car, GONZALEZ handed the UC a privately manufactured Polymer80, model PF940C, .40 caliber pistol and stated the supplier, whom I believe to be YBARRA, would have six additional firearms available once he finished building them.  GONZALEZ confirmed that the Polymer80 pistol was from the same supplier in Guadalupe.  The UC then paid GONZALEZ $1,300 for the pistol and an additional $100 for arranging this transaction and the previous firearms transaction with MALILAY.  GONZALEZ then got out of the CI's car, briefly returned to the F-150, and re-entered SUBJECT PREMISES 2.

103. Based on my observations during surveillance of the F-150, my knowledge of this investigation, and my examination of

47

various images of YBARRA (including publicly available images and California DMV images), I determined YBARRA to be the driver of the F-150. I later queried California DMV registration records and determined that the Ford F-150 was registered to an equipment rental company in Santa Maria, California. According to the rental agreement for the Ford F-150, YBARRA rented the pickup truck on April 20, 2023, listing the EY number and SUBJECT PREMISES 1 as YBARRA's contact information on the rental agreement.

104. I later retrieved a black privately manufactured Polymer80, model PF45, .45 caliber, pistol and a black and blue privately manufactured Polymer80, model PF940C, .40 caliber, pistol from the UC and placed them into ATF custody.

105. On April 24, 2023, I conducted surveillance outside SUBJECT PREMISES 3 and observed MALILAY's Ford Mustang parked in the eastern parking lot a short distance from SUBJECT PREMISES 3. I observed the apartment numbers "88" and "89" printed on a north-facing wall on the eastern end of the building that contained SUBJECT PREMISES 3. A short while later, I observed MALILAY emerge from the building containing SUBJECT PREMISES 3, meet with the driver of the burgundy Acura SUV, and then leave the area in the Ford Mustang.

### N. On May 18, 2023, MALILAY and GONZALEZ Sells Six Firearms to the UC and CI at SUBJECT PREMISES 2

106. Based on my review of phone calls and text messages, my conversations with other law enforcement officers, and my own observations, the UC and GONZALEZ communicated regarding

additional firearms transactions between April 28, 2023, and May 17, 2023.  GONZALEZ sent the UC multiple text messages of images of black and gray privately manufactured, Glock-type pistols, black and silver privately manufactured AR-type pistols, and a black privately manufactured AR-type pistol.  GONZALEZ and the UC agreed to conduct a firearms transaction on May 18, 2023, at SUBJECT PREMISES 2.

107.  On the morning of May 18, 2023, SBSO Detectives initiated surveillance in the area of SUBJECT PREMISES 3.  At approximately 10:10 a.m., law enforcement observed MALILAY arrive in the area of SUBJECT PREMISES 3 in the Ford Mustang, enter the building containing SUBJECT PREMISES 3, and re-emerge a short while later carrying a backpack.  MALILAY placed the backpack in the trunk of the Ford Mustang, got into the car, and left the area.  SBSO Detectives followed MALILAY from Lompoc to Guadalupe, where MALILAY briefly stopped in front of 4467 or 4473 2nd Street, before heading to SUBJECT PREMISES 2.

108.  Shortly thereafter, the UC and CI arrived in the CI's car, parked outside SUBJECT PREMISES 2, and contacted GONZALEZ.  GONZALEZ told the UC and CI to come inside SUBJECT PREMSIES 2.  The UC observed MALILAY's Ford Mustang parked in the driveway of SUBJECT PREMISES 2.  MALILAY emerged from the side entrance of SUBJECT PREMISES 2, and the UC followed him inside.

109.  Once inside SUBJECT PREMISES 2, MALILAY, GONZALEZ, and D.G., whom GONZALEZ described as another "builder" of firearms, met with the UC and CI.  MALILAY then removed a sheet covering six privately manufactured firearms, including five AR-style

49

pistols, and a Polymer80 Glock-type pistol, on a bed in GONZALEZ's room. MALILAY stated that he manufactured these firearms and demonstrated how the AR-type firearms functioned by manipulating the charging bolt of the firearms with and without a magazine loaded into them. MALILAY stated, "When I ride with it on safety, I usually just rack it and then I smack a mag in, and I put it on safety," referring to loading the firearms. MALILAY then displayed the Glock-type Polymer80 pistol to the UC. When the UC asked about the Glock pistol s/he knew MALILAY to carry on his person, MALILAY stated, "I got my Glock…Never letting this one go" and showed the UC a Glock pistol in his waistband.

110. Later, MALILAY stated he had to go to the "Nevada border" to obtain the lower receivers of the AR-style pistols and had purchased ten lower receivers at one time. MALILAY told the UC he planned to obtain additional upper receivers and manufacture more firearms.

111. MALILAY and the UC agreed to a price of $1,400 each for the four .223 caliber AR-style pistols, $1,200 for the Polymer80 Glock-type, 9mm caliber pistol, and $1,100 for the 9mm caliber AR-style pistol. MALILAY stated he was selling the 9mm caliber AR-style pistol for an unidentified associate who asked him to sell it. Following this, MALILAY demonstrated to the UC how to take apart the four AR-style pistols, stating that he was learning how to manufacture the AR-style pistols, and that the individual teaching him had been manufacturing firearms for a

while.  Following this, the UC gave MALILAY $7,800 for the six firearms, and the UC and CI then left the area.

112. SBSO Detectives observed MALILAY exit SUBJECT PREMISES 2, get into his Ford Mustang, and drive to Santa Maria, California, where he met with an individual driving a white Dodge Durango.[18]  MALILAY then drove back to Lompoc, California, where he entered the apartment complex containing SUBJECT PREMISES 3.

113. SA Traverso later retrieved the following six firearms from the UC and entered them into ATF custody:  (1) four silver and black .223 caliber AR-style pistols bearing no serial numbers; (2) a black 9mm caliber AR-style pistol bearing no serial number; and (3) a black 9mm caliber Polymer80 model PF940C pistol bearing no serial number.  All of the purchased firearms were privately manufactured.  SA Traverso also retrieved seven rounds of assorted 9mm Luger caliber ammunition.

### O.   YBARRA Had 19 eBay Orders of Firearms Parts and Accessories Shipped to SUBJECT PREMISES 1 between June 2021 and February 2023

114. Based on my review of documents obtained from eBay, I believe that YBARRA is the subscriber an eBay account with the User ID "ernyba-51" (the "EY eBay Account").  The EY eBay account listed SUBJECT PREMISES 1 as the shipping address and the EY number as the phone number.  Additionally, I determined that YBARRA used the EY eBay Account to complete approximately

---

[18] Based on California DMV records and my knowledge of this and other ATF investigations, I know that the Dodge Durango was registered to A.M., a suspected firearms trafficker.  Based on my review of surveillance video of the encounter, I believe that A.M. was the driver of the Dodge Durango.

19 orders for assorted firearms parts and accessories, including pistol slides, triggers, grips, sights, magazine releases, and barrels, which were shipped to SUBJECT PREMISES 1.  Some of these orders were from dealers who had a Federal Firearms License ("FFL").  Based on these facts and my knowledge of this investigation, I believe YBARRA was purchasing parts to manufacture firearms.

**P.    Two Machinegun Conversion Devices Were Purchased in YBARRA's Name and Shipped to SUBJECT PREMISES 1 in 2021**

115. In April 2023, during an unrelated ATF investigation into the illegal sale of machinegun conversion devices, commonly known as "Glock Switches", by online vendor "silencer-sales.com" ATF determined that Order #4734 for two "Full auto glock switch" devices for $200 was completed in YBARRA's name, phone number, SUBJECT PREMISES 1, and email, eybarras213@gmail.com.  The shipping address for the order was also in YBARRA's name and SUBJECT PREMISES 1.

**Q.    GONZALEZ, BEDARD, MALILAY, and YBARRA do not have FFLs**

116. Based on my training and experience, an FFL is required to engage in the business of dealing in firearms. Under the National Firearms Act, certain firearms and other items must also be registered with ATF in the National Firearms Registration and Transfer Record ("NFRTR").  As defined in 26 U.S.C. § 5845, firearms requiring registration include short-barreled rifles.

117. In or around mid-June 2023, ATF Industry Operations Investigators queried the Federal Licensing System database,

which is used to track the issuance of FFLs, and the NFRTR to
determine if GONZALEZ, BEDARD, MALILAY, and/or YBARRA have ever
had an FFL or have ever registered any items in the NFRTR.
According to these queries, GONZALEZ, BEDARD, MALILAY, and
YBARRA do not have FFLs or have never had any items registered
in the NFRTR.

### V.  <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

118. From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.    Persons who manufacture, possess, purchase, or
sell firearms generally maintain records of their firearm
transactions as items of value and usually keep them in their
residence or vehicles, or in places that are readily accessible,
and under their physical control, such in their digital devices.
It has been my experience that prohibited individuals who own
firearms illegally will keep the contact information of the
individual who is supplying firearms to prohibited individuals
or other individuals involved in criminal activities for future
purchases or referrals.  Such information is also kept on
digital devices on their person and in backpacks or purses in
their vicinity.

b.    Persons who manufacture, possess, purchase, or
sell firearms often keep their firearms and any associated
manufacturing equipment in their residence or vehicles, or in

places that are readily accessible, and under their physical control, such as stash houses.

       c.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       d.   Those who illegally manufacture or possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

       e.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

119. Based upon my training and experience and my participation in this investigation, I know that:

a. Drug traffickers often places assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually know or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

b. Persons involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made from engaging in narcotic trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

c. Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their

residences, vehicles, and/or businesses and stash houses, or
other locations controlled by them.

      d.   Drug traffickers commonly maintain addresses or
telephone numbers in books, papers, computers, cellular
telephones and other electronic data storage devices, and other
information that reveals the names, addresses, and/or telephone
numbers for their associates in the drug trafficking
organization, even if that information may be in code. Records
and electronic devices of this sort are frequently found on the
persons of drug traffickers or in their residences, motor
vehicles, and other locations controlled by them.

      e.   Drug traffickers frequently take, or cause to be
taken, photographs and/or videos of themselves, their
associates, or their property. Records in the form of
photographs and/or videos are often found in the residences,
offices, or other places under the control of drug traffickers,
and provide valuable evidence of the conspiratorial
relationships. Records of this type are sometimes in hard copy,
but are increasingly found stored on computers, cellular
telephones, thumb drives, and other items possessing the
capability of storing electronic data.

      f.   Drug traffickers often keep equipment and
materials for packaging, cutting, weighing, manufacturing, and
distributing controlled substances in their homes, stash houses,
or other locations controlled by them. That drug paraphernalia
often includes, but is not limited to, scales, plastic wrap,
plastic bags, surgical gloves, presses, and cutting agents as

well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers, which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs.  Large-scale drug traffickers sometimes use money counting machines to help count and sort the proceeds of drug trafficking.

g.   Drug traffickers commonly consign controlled substances and weapons to their clients and couriers.  They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances.  Records of this type are kept in location where traffickers have ready access to them, including on their person or in their residences, vehicles, businesses, stash houses, and smart telephones, tablets, and personal computers.  Drug and gun traffickers also normally maintain these items and records for long periods of times, regardless of whether their value to the dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about.  Thus documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep.  Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

h.    It is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs/firearms and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug and gun transactions; and use cellular telephones to facilitate their illegal distribution operations.

i.    Drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and uses coded communications.

j.    Drug traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

k.    Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence that list their names and addresses in that residence.  Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing, and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence are found.  Records and documents of this

type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that stores data electronically.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[19]

120. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

_____

[19] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

121. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

122. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb- and/or fingers of Jacob Wolfgang GONZALEZ ("GONZALEZ"), Joshua Nathan BEDARD ("BEDARD"), Kristopher Chase MALILAY ("MALILAY"), and Ernesto Roberto YBARRA ("YBARRA") on the device(s); and (2) hold the device(s) in front of the face of GONZALEZ, BEDARD, MALILAY, and YBARRA with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

123. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

124. For all of the reasons described above, there is probable cause to believe that GONZALEZ, BEDARD, MALILAY, and YBARRA have committed a violation of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License).  There is also probable cause that the items to be seized described in Attachment B-1 will be found in a search of the locations described in Attachments A-1, A-3, A-5, A-6, and A-7, and that the items described in Attachment B-2 will be found in a search of the locations described in Attachments A-2 and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _11_th day of
August 2023.


_____
THE HON. JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

63